UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DWAYNE J. JOHNSON,

       Plaintiff,

v.                              Case No. 8:11-cv-2372-T-33EAJ

CITY OF TAMPA,

       Defendant.
_____/

**ORDER**

This cause comes before the Court pursuant to Defendant City of Tampa's Motion for Summary Judgment (Doc. # 72), filed on March 1, 2013. Plaintiff Dwayne Johnson filed a response in opposition to the motion (Doc. # 91) on April 22, 2013. For the reasons that follow, the Court grants the motion.

**I.   Background**

Dwayne Johnson served as an employee of the City of Tampa Police Department from 1994 until his termination on October 16, 2009. (Johnson Dep. Doc. # 73 at 31; Notice of Disciplinary Action Doc. # 73-4). At the time of his termination, Johnson held the position of lieutenant. (Storck Aff. Doc. # 76 at ¶ 23).

Johnson, an African-American, claims that during his employment with the City he "was not considered for senior positions of Captain and Major, key positions that were given to other white comparators, who were less qualified than [Johnson], and [the City] made these decisions based upon race rather than qualifications." (Doc. # 48 at ¶ 7). Additionally, Johnson claims to have suffered adverse employment actions in retaliation for his complaints of discrimination. (Id. at ¶ 38).

### A.    <u>Failure to Promote</u>

Employees of the Tampa Police Department are assigned ranks within a chain of command.  That chain of command proceeds as follows, beginning with the lowest rank: officer, detective/corporal, sergeant, lieutenant, captain, major, assistant police chief, chief of police.  (Hogue Aff. Doc. # 75 at 1).  "Upon meeting specific requirements, officers are eligible for promotion to the next highest rank."    (<u>Id.</u>).    "To be eligible for promotion to lieutenant, a candidate must (1) have completed a promotional examination, and (2) have served in the rank of sergeant for a full year prior to the date of promotion to lieutenant." (<u>Id.</u>).

The process of determining which employees are eligible for promotion begins with the compilation of an "eligibility list." Lydia Storck, Classification and Testing Analyst for the City of Tampa, creates this list by identifying individuals who are eligible for promotion. (Storck Aff. Doc. # 76 at ¶¶ 2, 7). An eligibility list remains active for two years. "In that period of time, promotions may only be made from that list." (Id. at ¶ 10).

"Upon receipt of the eligibility list, the Command Staff, which includes five Majors, two Assistant Chiefs, and the Chief of Police, meets to discuss each candidate . . . to decide which are most qualified for the vacancies." (Hogue Aff. Doc. # 75 at 1).  The Command Staff is not confined to objective criteria in making their decisions, but rather may consider subjective factors in evaluating a candidate's qualifications.  (Id. at 2).  Following this meeting, each member of the Command Staff casts a secret ballot; each ballot counts as one vote, and no member's vote carries more weight than another.  (Id.).  The candidates with the highest numbers of votes are promoted to the vacant positions.  (Id.).

### 1.   April 30, 2004 Eligibility List

On April 13, 2004, the Tampa Police Department administered a promotional examination "to create an eligibility list for promotion to lieutenant for the two-year cycle that began on April 30, 2004." (Storck Aff. Doc. # 76 at ¶ 8). Johnson "scored 102.3 on the test and was listed as #1 on the eligibility list, which was ranked in order of scores achieved on the examination." (Id. at ¶ 9). As explained above, the Command Staff is not required to promote based on any objective metric -- including a candidate's numerical ranking. "Rather, any individual on the list may be promoted, regardless of whether those ranked numerically higher are passed over." (Id. at ¶ 10).

On June 20, 2004, five promotions to lieutenant were made from the April 30, 2004, eligibility list:

> #2 Martin Gonzalez, a Hispanic male who served as sergeant since March 9, 2003; #3 Robert Lovering, a white male who served as sergeant since November 10, 2002; #5 Daniel Lyons, a white male who served as sergeant since March 2, 2003; #7 Stephen Hartnett, a white male who served as sergeant since March 2, 2003; and #14 Luis Adan, a Hispanic male who served as sergeant since November 10, 2002.

(Id. at ¶ 12). Although Johnson was permitted to take the promotional exam in April of 2004 because he would become eligible for promotion during the two-year window during which the list would be effective, Johnson "was not

4

eligible for promotion to lieutenant until June 22, 2004, the date of his one year mark as a sergeant." (Id. at ¶ 11). Thus, Johnson was ineligible for promotion to lieutenant on June 20, 2004, when these five promotions occurred.

"[Johnson] was not the only candidate whose one year of service as a sergeant was completed on June 22, 2004, and thus was not eligible for promotion to lieutenant at the June 20, 2004 promotion ceremony despite having taken the examination. In fact, eight other sergeants on the eligibility list shared that [same] anniversary date and, like [Johnson], were not eligible for promotion until June 22, 2004." (Id. at ¶ 13). Of those eight sergeants, one was Hispanic, one was African-American, and six were white. (Id.).

Four additional promotions to lieutenant were made in the two-year period during which the April 30, 2004, eligibility list remained active, including:

> #6, Craig Sawicki, a white male who served as sergeant since December 26, 1993, and was promoted on April 24, 2005; #4, Joaquin Diaz, a Hispanic male who served as sergeant since June 22, 2003 and was promoted on December 4, 2005; #13, Alphonso Sams, an African-American male who served as sergeant since January 4, 2004 and was promoted on December 4, 2005; and #16 D. Hobley-Burney, an African-American female who served as

5

sergeant since January 4, 2004 and was promoted
on December 4, 2005.

(Id. at ¶ 14).

"In total, the April 30, 2004, eligibility list included six African-American[ ] candidates, including [Johnson]. One African-American candidate, Ronald Graham, did not pass the qualifying examination, and another, Ronald McMullen, withdrew from consideration. Of the remaining four, two (Sams and Hobley-Burney) were promoted during the cycle, and two ([Johnson] and Borthland Murray) were not." (Id. at ¶ 18).

## 2. June 6, 2006 Eligibility List

Another promotional exam was administered in 2006, and a new list based on that exam became effective as of June 6, 2006. (Id. at ¶ 20). Johnson tied for the third highest numerical score attained on the exam with a score of 87.0, and he was accordingly ranked "#3a." (Id.).

On November 5, 2006, the candidates promoted to lieutenant included:

> #2 Paul J. Lusczynski, a white male who served as sergeant since June 20, 2004; #3b Ronald McMullen, an African-American male who served as sergeant since June 22, 2003; and #7 Donald Peters, a white male who served as sergeant since June 22, 2003.

6

(Storck Aff. Doc. # 76 at ¶ 21).   "Notably, #1 David
Goodman, a white male, achieved the highest numerical score
on the relevant promotional examination[,] [b]ut Goodman
was not promoted to lieutenant during the two year cycle.
Six sergeants were promoted over Goodman, including
[Johnson] who was promoted on April 22, 2007.   (Id. at ¶
22).

B.   **Johnson's Disciplinary History and Charges of
Discrimination**

In early March of 2008, Johnson's former spouse
secured an injunction against him for domestic violence.
(Arb. Transcript Doc. # 74-1 at 48-49).   As a result of
that injunction, Johnson was not permitted to carry a
firearm on duty or off duty; accordingly, he was placed on
administrative duty in lieu of his normal work status.
(Id. at 50-51, 72).   After relinquishing all of his work-
related equipment and otherwise complying with the
injunction, Johnson submitted a letter to Assistant Chief
Castor to inform her that he had "divested [him]self of all
personally owned firearms."   (Johnson Letter Doc. # 74-9).
While on administrative duty, rather than coming in to work
at a desk job, Johnson "chose to take time off."   (Arb.
Transcript Doc. # 74-4 at 91; Request for Leave Doc. # 74-

15 at 1-3).

Due to certain statements made by Johnson's ex-spouse in obtaining the injunction, Johnson was directed to see "Dr. Skotko to undergo a fitness for duty examination." (Notice of Disciplinary Action Doc. # 73-3).   After Dr. Skotko explained to Johnson what the examination would entail, namely, the required "signing of release forms, a battery of tests and an interview," Johnson refused to sign the release forms.   (Id.).   Johnson's supervisor at that time, Captain Ruggiero, told Johnson: "'per the chief of police, you are to sign these releases and participate in this examination and give your full cooperation.'"   (Id.). Johnson disobeyed this direct order of his superior and thus, after an Internal Affairs investigation (Disposition Letter Doc. # 74-10), Johnson was formally notified that his actions violated the "Manual of Regulations # 1208 –- 'Insubordination.'"    (Id.).   Johnson received a one-day suspension as punishment for his insubordination.   (Id.).

On March 13, 2008, Johnson filed a charge of discrimination with the EEOC, alleging race and disability discrimination occurring on March 6, 2008.   (EEOC Charge

Doc. # 22-1).[1]   Within the Charge of Discrimination, Johnson

alleged the following facts:

> On [or] about March 6, 2008, I was suspended
> from my job unjustly and discriminatorily.
> Respondent reason is for insubordination.
> However, this is only a blatant pretext and the
> real reason is because of my race (African-
> American) and a perceived disability.
> My estranged spouse told Respondent that I
> have bipolar disorder.   Without any abnormal
> behavior history . . . Respondent suddenly
> suspended me, took away my weapon and sent me to
> a psychologist for a fitness for duty evaluation.
> . . . [W]hen I visited the psychologist, I was
> informed that when I signed the release form, the
> information will be discussed with the Chief of
> Police, Stephen Hogue.
> I refused to sign the release as I felt that
> this information was confidential and not shared
> with anyone.   Since I refused to sign the
> release, I was immediately suspended.

(Id.).

On August 12, 2008, Johnson filed a second Charge of

Discrimination with the EEOC, this time alleging

retaliation.   (EEOC Charge Doc. # 72-2 at 3).   Within that

Charge, Johnson alleged:

> Ever since I filed a charge of discrimination
> against Respondent, I have been treated
> differently.   My supervisor who is aware of my
> charge has been monitoring me closely.   My
> performance evaluation for the first time is

---

[1]   Although Johnson's original Complaint in this action
included claims premised upon the Americans with
Disabilities Act (Doc. # 1), Johnson subsequently amended
his Complaint to include only allegations of race
discrimination and retaliation (Doc. # 48).

> unsatisfactory . . . .  Respondent never observed
> me any [sic] type of negative behavior . . . .  I
> know that Respondent is retaliating against me
> only because I file[d] a charge of discrimination
> with the EEOC . . . .

(Id.).

On March 10, 2009, Johnson met with Major Sophie
Teague and told her "he had some complaints he wanted to
talk to the Chief [of Police] about."   (Teague Arb.
Transcript Doc. # 74-2 at 90).   When Teague asked "what
type of complaints," Johnson told her that she was
involved, so he could not tell her what his complaints
were.   (Id. at 91).   Teague told Johnson that, if the
complaints were about her, Johnson needed to meet with the
Assistant Chief.   (Id.).

According to Teague, Johnson declined to do so,
advising Teague "that the Assistant Chief, who would have
been Chief Castor at that time, . . . was [also] involved
in these complaints that he had."   (Id.).   Teague then
offered to make an appointment for Johnson with the Chief
of Police, but Johnson "said no, he was going to go down
and just sit in the Chief's office all day."   (Id.).
Teague advised Johnson that "you can't do that," but
Johnson insisted that "if the Chief refused to see him, he
was going to go to the Mayor."   (Id. at 91-92).   Again,

10

Teague advised Johnson that this would be inappropriate, and that "you can't go see the Mayor until the Chief has had the opportunity to address these concerns." (Id. at 92).

Despite Major Teague's instructions to the contrary, Johnson "proceeded to Police headquarters to meet with the Chief of Police, Stephen Hogue," but the Chief's assistant secretary informed Johnson that the Chief was unavailable. (Doc. # 48 at 11). Unable to garner a spontaneous meeting with Chief Hogue, Johnson traveled to the Mayor's office to "set an appointment" with the Mayor of Tampa. (Id.).

According to Johnson, "while waiting to set the appointment, Mayor Pam Iorio walked through an adjacent door and [Johnson] asked for three minutes of her time. The Mayor agreed and [Johnson] pr[o]ceeded to inform her about the egregious situation surrounding his chain of command up in to [sic] the Chief of Police." (Id.). According to Mayor Iorio, however, she encountered Johnson while "walking into [her] office. There's an outside lobby. [Johnson] stopped [her] before [she] could make the turn into the area that goes into the door and said, 'I need to talk to you about something.' And he kind of started in on what the issue was." (Arb. Transcript Doc. #

74-4 at 24-25).   Mayor Iorio recalls telling Johnson "something to the effect that he really needed to work his issues up through the chain of command, and that it just was not appropriate for him to be coming directly to me with a problem unless it's been worked up.  And then . . . I would have an opportunity to talk to the police chief about it."   (Id.).   However, even after the Mayor repeatedly told Johnson that he should follow the proper procedures for reporting his grievance, Johnson persisted in relaying his concerns to her.  (Id. at 31).

On March 18, 2009, Johnson attended an arbitration proceeding regarding his failure to sign Dr. Skotko's medical release forms and consequent suspension. (Arb. Transcript Excerpts Doc. # 73-9 at 2-3).   Johnson's testimony at that proceeding contradicted the statements he made in his March 13, 2008, EEOC Charge.  As reproduced above, Johnson claimed in the EEOC Charge that "[the City] suddenly suspended me, took away my weapon and sent me to a psychologist for a fitness for duty evaluation."  (EEOC Charge Doc. # 72-2 at 1).  However, during the March 18, 2009, arbitration, Johnson acknowledged that he voluntarily surrendered his weapon.  (Arb. Transcript Doc. # 74-1 at 97).   Indeed, according to the City, Johnson "was not

'suddenly suspended' and the City did not take away his weapon.  [Johnson] had to turn in his weapon in accordance with the terms of the injunction and he was placed on administrative duty.  [Johnson] chose to take time off [instead]."  (Doc. # 72 at 9).

Due to this contradiction, the City opened an Internal Affairs investigation wherein Captain John Newman determined that Johnson was untruthful in his sworn statement to the EEOC.  (Arb. Transcript Doc. # 74-4 at 58).  Due to this determination of untruthfulness, Major John Bennett recommended that Johnson be terminated.  (Arb. Transcript Doc. # 74-5 at 89).

Simultaneously, Johnson was the subject of another Internal Affairs investigation; this time, the investigation involved six charges relating to Johnson's neglect of supervisory duties.  (Disposition Letter Doc. # 74-17 at 5).  In February of 2009, Major Teague reviewed this Internal Affairs investigation and authored a disposition letter for the approval of Assistant Chief Castor.  (Id. at 1).  According to the letter, Major Honeywell had received reports that Corporal Kelly Daniel had repeatedly exhibited behavior indicating that she was under the influence of drugs or alcohol while on duty.

(Id.).  Daniel's behavior spanned a period of approximately six months, from April 2008 to October 2008.  (Id.).  On April 30, 2008, Major Honeywell advised Johnson of the complaints relating to Daniel's behavior and instructed Johnson to monitor Daniel and to take appropriate action, including a drug or alcohol test, if warranted.  (Id. at 2).  Johnson delegated this task to Sergeant Caravella, Daniel's direct supervisor.  (Id.).

After a mandatory evaluation by Dr. Skotko, Daniel was found "not fit for duty."  (Id. at 3).  Due to the lack of action by Johnson, as well as Sergeant Caravella, which "allowed Corporal Daniel to continue to work in the capacity of a law enforcement officer, placing herself and others in danger," the disposition letter sustained six charges "with regard to the performance of Lieutenant Dwayne Johnson," including attentiveness to duty, supervisory responsibilities, and subordinate misconduct. (Id. at 5).

On April 29, 2009, Internal Affairs opened an investigation into Johnson's encounter with the Mayor. (Arb. Transcript Doc. # 74-4 at 33, 39).  Former Assistant Chief of Police Robert Guidara, who authored the disposition letter for the Internal Affairs Complaint

regarding Johnson, explains:

> I concluded that [Johnson] was insubordinate in that he visited the Mayor of Tampa without having followed the instructions of his District Commander, Major Teague.  And that it was obvious even after he had an opportunity to have an audience with the Chief, but went to see the Mayor.  So based on Major Teague's testimony, that she was specific in advising [Johnson] on how to proceed, it was obvious that he was insubordinate in that he did not comply with those instructions. . . .  When you sustain insubordination, you have to . . . take the premise that the Major did in fact give him instructions.  He then accuses his major of not having instructed him to exercise the chain of command.  So based on an absence of any other information or evidence, I would have to find in the commander's favor that she did in fact, she gave lengthy testimony as to the instructions that she gave [Johnson] with regard to visiting or having an audience with the Chief of Police.

(Arb. Transcript Doc. # 74-3 at 78, 80-81).  Upon determining that Johnson (1) failed to comply with the lawful order of a commanding officer and (2) falsely accused Major Teague of being untruthful in stating that she gave Johnson an order, Assistant Chief Guidara recommended to Chief Hogue[2] that the charges of insubordination and untruthfulness in departmental matters be sustained.  (Disposition Letter Doc. # 74-18 at 2).

---

[2] The City explains that "Chief Castor, who previously held the position of Assistant Chief of operations, became Chief of Police in October, 2009, following the retirement of Chief Hogue."  (Doc. # 72 at 10 n.6).

A Notice of Disciplinary Action dated October 15, 2009, references both (1) Johnson's untruthful statements in the arbitration hearing and (2) Johnson's failure to comply with the order issued by Major Teague regarding his violation of the proper protocol for meeting with the Chief of Police. (Notice of Disciplinary Action Doc. # 73-4). That Notice prescribed Johnson's dismissal, effective October 16, 2009. (Id.).

Meanwhile, as the Internal Affairs investigations surrounding Johnson's charges of untruthfulness and insubordination progressed, Johnson filed a series of Charges with the EEOC. On May 21, 2009, Johnson alleged in an EEOC Charge that he was the target of ongoing retaliation by his employer because he filed a Charge of Discrimination with the EEOC in March of 2008. (EEOC Charge Doc. # 72-2 at 4). Within that Charge, Johnson refers to (1) the charges stemming from his neglect of supervisory duties regarding Corporal Daniel, (2) the charge of untruthfulness arising from Johnson's inconsistent statements in arbitration and in his prior EEOC Charge, and (3) the charge of insubordination regarding Johnson's failure to follow an order from Major Teague. (Id.).

16

On July 30, 2009, Johnson filed another Charge of Discrimination with the EEOC, this time alleging that the City had been "constantly harassing" him ever since he filed a Charge with the EEOC.  (Id. at 5).  Finally, on October 20, 2009, Johnson filed yet another EEOC Charge alleging: "After my employer conducted an unfair and unjust investigation into my complaints and allegations, my employer terminated my services.  I believe that my employer retaliated against me . . . ."  (Id. at 6).

On October 20, 2011, Johnson filed the original Complaint in this action for discrimination and retaliation.  (Doc. # 1).  The City filed the instant Motion for Summary Judgment (Doc. # 72) on March 1, 2013, and Johnson filed a response in opposition to the motion on April 22, 2013.  (Doc. # 91).

## II. <u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  <u>Anderson</u>

17

v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is

presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).  However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

### III. Discussion

#### A.    Failure to Exhaust Administrative Remedies

##### 1.    Timely Filing

The City argues that Johnson's claims relating to "the alleged failure to promote are time barred [in accordance with 42 U.S.C. § 2000e-5(e)(1)] because [Johnson] did not file a timely charge of discrimination with the EEOC."

(Doc. # 72 at 13).   In prescribing the "time for filing charges," 42 U.S.C. § 2000e-5(e)(1) provides:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier . . . .

"Failure to promote" is a discrete discriminatory act. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).   As the Supreme Court explained in Morgan, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.   The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred." Id. at 113.

Johnson first filed a Charge of Discrimination with the EEOC, which did not mention the alleged failure to promote, on March 13, 2008.   (EEOC Charge Doc. # 93 at 2). Thus, to the extent Johnson attempts to premise his

discrimination claim on the City's failure to promote him
in 2004 and 2006, those claims are time-barred.  However,
"[t]he existence of past acts and the employee's prior
knowledge of their occurrence . . . does not bar employees
from filing charges about related discrete acts so long as
the acts are independently discriminatory and charges
addressing those acts are themselves timely filed.  Nor
does the statute bar an employee from using the prior acts
as background evidence in support of a timely claim."
Morgan, 536 U.S. at 113.

In conclusory fashion, Johnson alleges in the Amended
Complaint (Doc. # 48 at 16) and in his response to the
Motion for Summary Judgment (Doc. # 91 at 6) that the
City's actions created a hostile work environment, and thus
that "the defendant's discriminatory acts of 2004 are not
time barred because they are sufficiently related to the
EEOC complaints filed by the Plaintiff."  Id.

However, "hostile work environment claims are
different in kind from discrete acts. . . . The 'unlawful
employment practice' . . . cannot be said to occur on any
particular day.  It occurs over a series of days or perhaps
years and, in direct contrast to discrete acts, a single
act of harassment may not be actionable on its own."

Morgan, 536 U.S. at 115.  "In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 116 (internal quotations omitted).

The Court determines that the facts in this case do not give rise to an actionable hostile work environment claim.   Johnson alleges only discrete instances of allegedly discriminatory or retaliatory conduct.   See Freeman v. City of Riverdale, 330 F. App'x 863, 866 (11th Cir. 2009) ("[Appellant] cannot establish a hostile work environment by reference to his 2001 or 2003 terminations, his assignment to janitorial tasks upon reinstatement, or the denial of his requests for training, because they were discrete acts that were required to be challenged separately.").  Although Johnson claimed in his July 30, 2009, EEOC Charge that [the City] was "constantly harassing" him by subjecting him to "constant monitoring and department counseling," (EEOC Charge # 72-2 at 5), Johnson does not claim to have suffered from the cumulative

effect of physically threatening or humiliating discriminatory conduct that unreasonably interfered with his work performance, nor to have suffered any type of repeated harassment for which the individual acts might not be independently actionable.  See Morgan, 536 U.S. at 115. Accordingly, the Court finds Johnson's hostile work environment argument unconvincing, and correspondingly finds Johnson's failure to promote claims to be time-barred.

### 2.   Scope of EEOC Charge

"A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Stuart v. Jefferson Cnty. Dep't of Human Res., 152 F. App'x 798, 801 (11th Cir. 2005) (quoting Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1280 (11th Cir. 2004)). "Judicial claims that 'amplify, clarify, or more clearly focus' the allegations in the EEOC charge are permitted, but the plaintiff cannot allege new acts of discrimination."  Id. (quoting Gregory, 355 F.3d at 1279-80).  None of Johnson's five EEOC charges mentions that Johnson suffered discrimination in the form of a denied promotion.  (See EEOC Charges Doc. # 72-2 at 1-6).  Thus,

Johnson's failure-to-promote claims constitute "new acts of discrimination" which neither amplify nor clarify the allegations in his EEOC charges.   Furthermore, both occasions on which Johnson claims to have been wrongfully denied promotion occurred before Johnson filed his first charge of discrimination, and thus cannot be said to have "grown out of" Johnson's claims.

Accordingly, in addition to the Court's determination that the failure-to-promote claims are time-barred, the Court finds these claims to be procedurally barred on the alternative basis that they are outside the scope of the EEOC charges.[3]

B.   **Discrimination**

In Counts I and II, Johnson alleges discrimination in violation of Title VII and the FCRA.   "The Florida courts have held that decisions construing Title VII are

---

[3] The Court notes that, even if Johnson's failure-to-promote claims were not procedurally barred, Johnson has not identified a single comparator for purposes of supporting these discrimination claims.   In response to the Motion for Summary Judgment, Johnson claims: "Luis Adan was a comparator[,] he was promoted to Lieutenant in 2004 and Captain in 2005."   (Doc. # 91 at 5).   However, Adan (a Hispanic male) had been promoted to sergeant in November of 2002, therefore he met the one-year requirement and was eligible for promotion on June 20, 2004. (Doc. # 73-1). Johnson acknowledged in his deposition that no sergeant was promoted to lieutenant prior to the satisfaction of the one-year requirement.   (Johnson Dep. Doc. # 73 at 41-42).

applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). "In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence, or statistical evidence." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without inference or presumption. Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic] constitute direct evidence of discrimination." Tippie v. Spacelabs Med., Inc., 180 F. App'x 51, 54 (11th Cir. 2006) (quoting Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla., 256 F.3d 1095, 1105 (11th Cir. 2001)). Johnson presents no direct or statistical evidence of discrimination.[4] Thus, Johnson's case is limited to circumstantial evidence.

---

[4] Johnson appears to contend in his deposition that the City failed to promote a certain percentage of African American individuals by performing a seemingly impromptu "statistical" analysis. (Johnson Dep. Doc. # 73 at 51-52).

In analyzing allegations supported by circumstantial evidence under Title VII, the Court follows the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. See Harper, 139 F.3d at 1387. Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. McDonnell Douglas, 411 U.S. at 802-03. Once the plaintiff has established a prima facie case, the burden of proof shifts to the defendant. Id.; Dickinson v. Springhill Hosps., Inc., 187 F. App'x 937, 939 (11th Cir. 2006).

To rebut the presumption of discrimination created by the plaintiff's prima facie case, the defendant must provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against the plaintiff. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Standard, 161 F.3d at 1331. However, "[t]his is a burden of production, not persuasion." Standard, 161 F.3d at

However, the Court, for the procedural reasons explained above, has no occasion to consult this evidence for purposes of ruling on the Motion for Summary Judgment. Additionally, this statistical discussion appears only in Johnson's deposition, and Johnson does not raise the issue in the operative Complaint or in response to the Motion for Summary Judgment.

1331.  A defendant "must merely produce evidence that could allow a rational fact finder to conclude" its actions were not motivated by discriminatory animus.  Id.

If the defendant produces such evidence, the burden shifts again to the plaintiff.  McDonnell Douglas, 411 U.S. at 802-03.  The plaintiff then "has the opportunity to come forward with evidence, including the previously produced evidence establishing [his] prima facie case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).

In the instant case, the Court need not employ the abovementioned burden-shifting analysis because Johnson has failed to establish a prima facie case of race discrimination.  "A plaintiff establishes a prima facie case of disparate treatment by showing that [he] was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).

In the Amended Complaint, Johnson alleges race discrimination in the context of his failure-to-promote

claims which, as the Court previously explained, are procedurally barred. Additionally, Johnson's March 13, 2008, EEOC Charge alleged that his suspension for insubordination stemming from Johnson's refusal to sign Dr. Skotko's medical release forms was "a blatant pretext and the real reason is because of my race . . . ." (Doc. # 72-2 at 1). However, Johnson has failed to allege that the City has shown different treatment to any similarly situated employee outside his protected class.

Johnson appears to attribute the remainder of his adverse employment actions to the City's improper retaliation against him for filing EEOC Charges. However, to the extent Johnson intends to claim that any other adverse employment action is a result of race discrimination, the Court similarly finds that Johnson has failed to establish a prima facie case. Johnson has failed to demonstrate, with regard to any adverse employment action alleged, that the City treated him unlike any similarly-situated employee outside his protected class.[5]

---

[5] To the extent Johnson's deposition identifies Corporal Amanda Wilson and Sergeant Don Peters as comparators for untruthfulness, the City has provided evidence demonstrating that neither individual was ever found to have violated standard operating procedures of the Tampa

<u>See</u> <u>McDowell v. S. Nuclear Operating Co., Inc.</u>, 251 F. App'x 651, 653 (11th Cir. 2007) ("To show that employees are similarly situated, the plaintiff must establish that the employees are 'similarly situated in all relevant respects.'  The comparator must be 'nearly identical' to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.").

Additionally, even if Johnson had established a prima facie case of discrimination, summary judgment for the City would still be appropriate because, as discussed more fully below, the City provided legitimate, nondiscriminatory reasons for each instance in which Johnson was affected by an adverse employment decision, and Johnson has failed to show that those reasons were pretextual.

The evidence submitted by Johnson in this case consists entirely of two EEOC Charges of Discrimination and Letters of Determination.  (Doc. # 93).  "The Eleventh Circuit has determined that an EEOC determination may be admissible evidence in a jury trial so long as it is not unduly prejudicial."  <u>Keaton v. Cobb Cnty.</u>, 545 F. Supp. 2d 1275, 1310 (N.D. Ga. 2008) (citing <u>Walker v. NationsBank of</u>

---

Police Department by engaging in acts of insubordination or untruthfulness.  (Bartlett Decl. Doc. # 77 at 1).

Fla. N.A., 53 F.3d 1548, 1554-55 (11th Cir. 1995)). "However, a district court is not required to defer or make reference to the EEOC determination in its opinion deciding summary judgment and therefore, is not required to find the determination creates an issue of material fact." Id. at 1310-11 (citing Kincaid v. Bd. of Trs., 188 F. App'x 810, 817 (11th Cir. 2006)); Moore v. Devine, 767 F.2d 1541, 1551 (11th Cir. 1985). "It is the Court's, not the EEOC investigator's, duty to determine whether issues of material fact exist. As a result, an EEOC determination letter is suitable for framing but does not create an issue of fact." Id. at 1311 (internal citations omitted).

Accordingly, the City is entitled to summary judgment on Johnson's claims that the City discriminated against Johnson on the basis of race.

### C.   **Retaliation**

In Count III, Johnson alleges retaliation in violation of Title VII and the FCRA. As in the case of Johnson's discrimination claims, the Court's Title VII retaliation analysis applies equally to the FCRA. See Howard v. Walgreen Co., 605 F.3d 1239, 1244 n.4 (11th Cir. 2010) ("Because retaliation claims under the FCRA are

substantively similar to Title VII retaliation claims, we use the same analysis for both claims.").

"Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-3(a)). "A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation omitted).

"Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action.  The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff."  Id.

In the present case, "the City does not challenge the Plaintiff's ability to establish that he engaged in protected activity on and after March 13, 2008, and was subject to adverse [employment] actions."  (Doc. # 72 at 20).  Rather, the City argues that Johnson "cannot show any causal nexus between the adverse actions and protected activity, and [Johnson] cannot rebut the City's legitimate, non-discriminatory reasons for taking the challenged adverse actions." (Id.).

### 1.  **Causal Connection**

To demonstrate a causal connection, Johnson must show that the City's decision maker was aware of the protected activity and that the protected activity and the adverse action were not wholly unrelated.  Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998). "[C]lose temporal proximity may be sufficient to show that

the protected activity and the adverse [employment] action
were not wholly unrelated." McCann v. Tillman, 526 F.3d
1370, 1376 (11th Cir. 2008) (quotation and citation
omitted).   However, "merely showing that the alleged
adverse action occurred sometime after the protected
expression does not establish the causation element -- for
temporal progression to be enough, the events must be in
'very close' proximity." Davis v. Coca-Cola Bottling Co.
Consol., 516 F.3d 955, 978 n.52 (11th Cir. 2008) (citations
omitted).

In the instant case, Johnson claims to have suffered
multiple adverse employment actions as a result of
retaliation, including: (1) his June 2008 suspension for
insubordination relating to Johnson's refusal to sign a
medical release (Notice of Disciplinary Action Doc. # 74-
16); (2) an unfavorable performance evaluation rating in
the summer of 2008 (EEOC Charge Doc. # 72-2 at 3); (3) the
charges imposed in March of 2009 relating to neglect of
supervisory duties for Johnson's inaction regarding
Corporal Daniel (Disposition Letter Doc. # 74-17); (4) the
July 2009 charge of insubordination for Johnson's failure
to comply with Major Teague's order to allow the chain of
command to address Johnson's complaint (Disposition Letter

Doc. # 74-18); (5) the September 2009 charge of untruthfulness in department matters relating to Johnson's contradictory statements about surrendering his weapon and being suspended due to the injunction entered against him in March of 2008 (Disposition Letter Doc. # 74-19); and (6) Johnson's termination in October of 2009. (Notice of Disciplinary Action Doc. # 73-4).

These adverse employment actions coincide with the timing of Johnson's EEOC Charges of Discrimination, which are dated March 13, 2008; August 12, 2008; May 21, 2009; July 30, 2009; and October 20, 2009. (EEOC Charges Doc. # 72-2 at 1-6). Due to the close proximity between the adverse actions complained of and Johnson's protected activities, the Court will assume that the causation requirement is satisfied, and thus that Johnson has established a prima facie case of retaliation.

### 2.   **Burden Shifting Analysis**

Once a plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to offer a legitimate, non-retaliatory reason for the challenged employment action. Pennington, 261 F.3d at 1266. If the City offers legitimate reasons, "the presumption of

retaliation disappears." Sullivan v. Nat'l R.R. Passenger
Corp., 170 F.3d 1056, 1059 (11th Cir. 1999).

The City has offered legitimate, non-retaliatory
reasons for each of its adverse employment actions against
Johnson. First, with regard to Johnson's June 2008
suspension for insubordination, Assistant Chief Castor has
clarified that "our insubordination policy states that
'employees shall promptly obey lawful orders of a
supervisor.' There is no room for misunderstanding an
order, especially in a para-military organization, when a
supervisor gives instruction for a specific task to be
completed and outlines the consequences for failure to
complete that task." (Disposition Letter Doc. # 74-10).
With an understanding of this fundamental policy, Captain
Ruggiero explained under oath in an arbitration proceeding
that "[Major] Honeywell told me [to] go [to Dr. Skotko's
office] and give [Johnson] a direct order to cooperate with
the doctor or he's relieved from duty." (Arb. Transcript
Doc. # 74-1 at 44). Accordingly, Captain Ruggiero drove to
Dr. Skotko's office, taking Captain Gonzalez as a witness,
and "told [Johnson] to sign the paperwork, cooperate with
the doctor or you're relieved from duty." (Id. at 44-45).
Johnson again declined to sign the forms despite receiving

a direct order to do so. (Id.). Accordingly, Johnson's failure to promptly obey the lawful order of a supervisor as required by the City's insubordination policy constitutes a legitimate, non-retaliatory reason for Johnson's resulting suspension.[6]

Second, the City has provided legitimate reasons for Johnson's "below expectations" performance evaluation for the year ending in April of 2008. Captain Ruggiero explained that this particular evaluation "was held up because [Johnson] had an Internal Affairs investigation." (Arb. Transcript Doc. # 74-1 at 139). Ruggiero additionally explained that, on March 6, 2008, at 1:00 a.m., Johnson had "a domestic dispute out in the lobby [of the police station] with his wife." (Id. at 140). The City found this episode, combined with Johnson's "losing his temper" with other law enforcement personnel, to constitute sufficiently egregious occurrences to warrant a below expectations rating on Johnson's performance evaluation. (Id. at 149). The City additionally found that Johnson was well aware of these issues, and that the

---

[6] Assistant Chief Castor testified at an arbitration proceeding that "one-day suspension is the common suspension for insubordination." (Arb. Transcript Doc. # 74-1 at 73).

unfavorable rating should have come as no surprise to him. (<u>Id.</u>).   Accordingly, the City has provided legitimate reasons for Johnson's negative performance evaluation.

Third, the City has provided legitimate, non-retaliatory reasons for the "neglect of supervisory duties" charges imposed upon Johnson in March of 2009 for his inaction in the matter of Corporal Daniel. (Disposition Letter Doc. # 74-17).   As Major Teague explained in her Internal Affairs Investigation disposition letter to Assistant Chief Castor, "[t]he lack of action by Lieutenant Johnson and Sergeant Caravella [(to whom Johnson delegated his order to observe Corporal Daniel)] allowed Corporal Daniel to continue to work in the capacity of a law enforcement officer, placing herself and others in danger." (<u>Id.</u> at 4).[7]

Manual of Regulations # 1701, "Supervisory Responsibilities," which Johnson was alleged to have violated in connection with the Corporal Daniels matter, provides:

> Supervisors shall be responsible for compliance with department rules, regulations, orders and procedures. . . . Supervisors have responsibility

---

[7]   Johnson and Sergeant Caravella received identical dispositions with regard to this incident. (Disposition Letter Doc. # 74-17 at 4-5).

for directing the performance of all subordinates
assigned to them.    While they can delegate
authority   and   functions   to   subordinates,
supervisors cannot delegate responsibility.

(Manual of Regs. Doc. # 74-20).  Accordingly, because Major

Honeywell "instructed Lieutenant Johnson to monitor

Corporal Daniel and to take the appropriate action,

[including] drug or alcohol test, if warranted," Johnson

was responsible for compliance with this order despite his

decision to delegate the task to Sergeant Caravella.

(Disposition Letter Doc. # 74-17 at 2).  Correspondingly,

Johnson's responsibility warranted the five related charges

of (1) Attentiveness to Duty, (2) Subordinate Misconduct,

(3) Failure to Comply: Departmental Policies S.O.P 652

Substance Abuse Examination Program, (4) Duties and

Responsibilities of Lieutenant Assigned to District Patrol

Division, and (5) Employee Assistance Program.  (Id. at 5).

Thus, the City has provided a legitimate, non-retaliatory

reason for its actions taken against Johnson in relation to

the Corporal Daniel incident.

Fourth, regarding Johnson's 2009 charge of

insubordination for refusing to comply with a direct order

given by Major Teague, the City's non-retaliatory reasons

for imposing the charge are outlined in an Internal Affairs

disposition letter from Assistant Chief Guidara to Chief
Hogue:

> The primary issue . . . is whether or not Lt.
> Johnson complied with the lawful orders of his
> commanding officer, Major S. Teague, when he met
> with Mayor Iorio and attempted to meet with Chief
> Hogue without scheduling an appointment to see
> either as instructed by Major Teague.    Ten
> employees offered sworn testimony in this case
> [including] four administrative assistants, three
> police officers, Major Teague, Mayor Iorio and
> subject officer Lt. Johnson.   The preponderance
> of the evidence . . . clearly illustrates that
> Lt. Johnson did not schedule an appointment to
> see either Chief Hogue or Mayor Iorio as ordered.
> Furthermore, he did not allow his chain of
> command to address his complaint prior to seeking
> an audience with Mayor Iorio as ordered by Major
> Teague.

(Disposition Letter Doc. # 74-18 at 2).   Thus, the City has
provided a legitimate, non-retaliatory reason for Johnson's
charge of insubordination stemming from his contact with
the Mayor.

Fifth, the City has provided legitimate reasons for
disciplining Johnson in relation to his 2009 charge of
"untruthfulness in departmental matters."    (Disposition
Letter Doc. # 74-19).   These non-retaliatory reasons are
outlined in an Internal Affairs disposition letter from
Captain Newman to Chief Castor in September of 2009, which
provides, in relevant part:

> In Lt. Johnson's own testimony in response to
> being questioned by Mr. Gonzalez in the
> arbitration hearing, he admits to signing the
> EEOC form and stated "perhaps the EEOC didn't
> quite understand what I was saying, but I signed
> it." Above all else, the supporting
> documentation in the form of Request for
> Leave/Payroll History, the EEOC "Charging" Form
> authored or approved by Lt. Johnson, as well as
> the Temporary Injunction Order Against Domestic
> Violence detailing the limitations placed on Lt.
> Johnson by a judge a[s] it pertained to
> firearms[,] provide . . . impartial factors to
> consider. Finally, this case was reviewed by the
> office of the U.S. Attorney/Middle District. A
> letter drafted on August 3, 2009 by United States
> Attorney Robert E. O'Neill indicates that the
> elements of the crime of perjury do exist, but
> that the matter would be more appropriately
> handled through departmental administrative
> process[es].

(Id. at 3). Based on these factual findings, the City charged Johnson with two violations of the Manual of Regulations: (1) Conformance to Laws and (2) Truthfulness in Departmental Matters. (Id.). Thus, the City has provided legitimate, non-retaliatory reasons for Johnson's discipline relating to his inconsistent statements between the 2009 arbitration and the March 2008 EEOC Charge.

Lastly, the City has provided legitimate reasons for Johnson's October 2009 termination. The Notice of Disciplinary Action prescribing Johnson's termination references (1) Johnson's untruthfulness in sworn statements to the EEOC, (2) Johnson's failure to comply with Major

40

Teague's order regarding scheduling an appointment with the Chief and allowing the chain of command to address Johnson's concerns, and (3) Johnson's false accusations that Major Teague was untruthful. (Notice of Disciplinary Action Doc. # 73-4). The City maintains that untruthfulness in departmental matters alone constitutes grounds for termination of a police officer. (Doc. # 72 at 24). To support this contention, the City provides a General Order published by the Office of the Chief of Police to all divisions of the Tampa Police Department in 1994 stating that "untruthfulness is not tolerated by this Department, and it will continue to be treated as among the most serious offenses which an employee can commit. Any sustained incident of untruthfulness of any pending or future cases will be treated in accordance with that philosophy and subject the employee to immediate termination." (General Order Doc. # 74-8). Thus, the City has provided ample legitimate, non-retaliatory reasons for Johnson's termination in the fall of 2009.

Furthermore, the City correctly notes that termination based on a good faith belief of misconduct is legitimate, even if it is later determined that no misconduct occurred. See EEOC v. Total Sys. Serv., 221 F.3d 1171, 1176-77 (11th

Cir. 2000) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."). Based on this principle, the City's good faith determination that Johnson violated his obligation of truthfulness in departmental matters would be sufficient grounds for Johnson's termination even if it were determined in the future that no misconduct actually occurred.

As stated in <u>Alexander v. Fulton County, Georgia</u>, 207 F.3d 1303, 1341 (11th Cir. 2000), "it is not the court's role to second-guess the wisdom of an employer's decision." The City of Tampa has provided an abundance of evidence demonstrating legitimate, non-retaliatory reasons for Johnson's various disciplinary proceedings and eventual termination. Accordingly, Johnson bears the ultimate burden of proving that the reasons provided by the City are a pretext for prohibited, retaliatory conduct.

### 3.  **Pretext**

Just as Johnson failed to show that the City's adverse employment actions were pretextual in the discrimination context, Johnson has likewise failed to show that the City's adverse employment actions were a pretext for

retaliation.  As previously explained, Johnson offers only two EEOC Charges of Discrimination and their corresponding Letters of Determination as evidence in response to the Motion for Summary Judgment.  The response itself contains little more than conclusory assertions such as "Plaintiff would not have been suspended nor fired if he had not reported the [D]efendant's discriminatory activity to the EEOC." (Doc. # 91 at 6).  Accordingly, because Johnson has failed to establish that the City's legitimate reasons for the adverse employment actions were pretextual, the Court finds that the City's Motion for Summary Judgment is due to be granted.

**IV.  Conclusion**

The Court finds the City's legitimate reasons for each challenged employment decision to be dispositive.  Even assuming that Johnson has established a prima facie case of both discrimination and retaliation, Johnson has fallen far short of demonstrating that the legitimate reasons proffered by the City for each adverse employment action were pretextual.  The Court thus grants the City's Motion for Summary Judgment.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant's Motion for Summary Judgment (Doc. # 72) is

**GRANTED**.   The Clerk is directed to enter judgment in

favor of the Defendant.

(2)   The Clerk is directed to terminate any pending motions

and thereafter to close this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this

9th day of May, 2013.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record